IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:20CR482 |
| | ) |        5:21CR707 |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| JOE L. FLETCHER III, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

Now comes the United States of America, by and through its undersigned counsel, and submits this sentencing memorandum setting forth its sentencing recommendation in the above-captioned cases.

## I.     INTRODUCTION AND RECOMMENDATION

Defendant Joe L. Fletcher III has lived a life centered on criminal activity.  Since the age of sixteen, Defendant has consistently engaged in offenses involving violence, threats of violence, drug trafficking, and illegal firearm possession.  Even while incarcerated and on supervision for many of those offenses, Defendant has routinely engaged in additional criminal activity and failed to comply with conditions imposed upon him by courts, both state and federal. Defendant has shown no remorse for his crimes or any acknowledgment of the wrongfulness of his conduct.  Instead, Defendant has boasted about his criminal lifestyle and has used it to bolster his reputation as a dangerous criminal in the Akron area.

The offenses for which Defendant is now before this Court for sentencing are representative of the crimes he has repeatedly committed for much of his life.  The offense conduct in the above-captioned cases includes possessing cocaine for distribution, illegally possessing firearms on multiple occasions, threatening violence against law enforcement

officers, and deliberately violating conditions imposed both by this Court and the Summit County Court of Common Pleas.  Throughout the pendency of these cases, Defendant has shown no recognition of the seriousness of his criminal conduct.

Title 18, United States Code, Section 3553(a) sets forth the factors that a court is to consider in imposing sentence on a defendant.  Those factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [for the offense(s) of conviction under the advisory United States Sentencing Guidelines].

18 U.S.C. § 3553(a).

For the reasons below, the United States recommends that the Court, in consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), apply an upward variance from the advisory Sentencing Guidelines range applicable under the proposed Guidelines calculation included in this memorandum and impose a sentence of 240 months imprisonment.

## II.      RECOMMENDED SENTENCING GUIDELINES CALCULATION

### A.  Offense Level Calculation

For purposes of determining the advisory Sentencing Guidelines offense level, the

Presentence Investigation Report (PSR) groups the offenses in Counts 1, 2, and 4 in case number

5:20CR482, and Count 1 in case number 5:21CR707, pursuant to U.S.S.G. § 3D1.2(c) and (d)

("Group 1").  (ECF #158: PSR, PageID 1157-58.[1])  The United States agrees that these offenses

are properly grouped for sentencing.

The advisory Sentencing Guidelines offense level calculation in the PSR begins with a

base offense level 24 for Group 1 pursuant to U.S.S.G. § 2D1.1(c)(8) based upon Defendant's

possession with intent to distribute 39.3893 grams of cocaine base, as charged in Count 2 of case

number 5:20CR482.  (*Id.*, PageID 1158.)  Two levels are added pursuant to § 2D1.1(b)(2)

because Defendant used violence, made a credible threat of violence, or directed the use of

violence.  (*Id.*)  Another two levels are added pursuant to § 3C1.1 because Defendant obstructed

justice, both by attempting to bribe a government witness and by escaping from custody.  (*Id.*)

Finally, two additional levels are added pursuant to § 3C1.2 because Defendant recklessly

created a substantial risk of death or serious bodily injury to another person while attempting to

flee from police on both June 24, 2020, and September 8, 2020.  The total offense level for

Group 1, as determined in the PSR, is 30.  (*Id.*, PageID 1158-59.)

While the United States does not contest the accuracy of the Group 1 offense level

calculation in the PSR according to the current Sentencing Guidelines, it is the government's

position that, in an effort to avoid unwarranted sentencing disparities between crack and powder

---

[1]       Unless otherwise noted, references herein to the Court's electronic docket (ECF) and
PageID numbers relate to the docket in case number 5:20CR482.

cocaine, in cases involving cocaine base (crack) the offense level should be determined using the powder cocaine guidelines rather than those applicable to cocaine base (crack). Accordingly, in this case, the United States recommends that the base offense level for the offense in Count 2 in case number 5:20CR482 should be 12 pursuant to § 2D1.1(c)(14). After application of the enhancements described in the PSR, the total offense level for the offense in Count 2 is 18. Because, as noted in the PSR (*Id.*, PageID 1158) and shown below, the total offense level for Counts 1 and 4 in case number 5:20CR482 is 26, the United States recommends that the Group 1 offense level is 26.

Specifically, the United States believes that the following represents the proper advisory Sentencing Guidelines calculation to be applied in these cases:

| **GROUP 1** | | |
|---|---|---|
| *5:20CR482* | | |
| <u>Counts 1 and 4</u>: Felon in Possession of a Firearm and Ammunition, 18 U.S.C. § 922(g)(1) | | |
| <u>Count 2</u>: Possession with Intent to Distribute a Controlled Substance, 21 U.S.C. § 841(a)(1), (b)(1)(B) | | |
| *5:21CR707* | | |
| <u>Count 1</u>: Escape, 18 U.S.C. § 751(a) | | |
| Base offense level | 22 | § 2K2.1(a)(3) |
| Obstruction of justice | +2 | § 3C1.1 |
| Reckless endangerment during flight | +2 | § 3C1.2 |
| **Total Offense Level** | **26** | |

| *5:20CR482* | | |
|---|---|---|
| <u>Count 3</u>: Possession of a Firearm in Furtherance of a Drug Trafficking Offense, 18 U.S.C. § 924(c)(1)(A)(i) | | |
| Base offense level | 60 months, consecutive to any other sentence imposed | § 2K2.4(b) |

**B.  Criminal History Category**

The United States agrees with the Probation Officer's determination in the PSR that Defendant's prior convictions and probation status score a total of 14 criminal history points, resulting in a Criminal History Category VI.  (ECF #158: PSR, PageID 1170.)

In addition, the United States agrees with the Probation Officer's responses to Defendant's objections 8 and 9, which relate to Defendant's 2019 conviction in Stow Municipal Court case number 2019TRD07971 for Failure to Reinstate License.  (*Id.*, PageID 1192-93.) Defendant was ordered in that case to "obey all laws for 2 years."  (*Id.*)  "An Ohio condition to 'obey [the] laws' is the functional equivalent of probation for purposes of [U.S.S.G.] § 4A1.1(d)."  *United States v. Brown*, 784 F. App'x 308, 311 (6th Cir. 2019) (citing *United States v. DeJournett*, 817 F.3d 479, 484 (6th Cir. 2016)).[2]  For the reasons set forth in the Officer's response to those objections, one criminal history point is properly assigned to that conviction.

Likewise, the United States agrees that one criminal history "status point" is assigned pursuant to § 4A1.1(e) because Defendant was under a criminal justice sentence, namely the Stow Municipal Court sentence discussed above, at the time he committed the offenses in the instant cases.

Applying the offense level calculation set forth above and a Criminal History Category VI, the advisory Sentencing Guidelines range for the offenses in Group 1 is 120-150 months imprisonment.  Adding the mandatory consecutive 60-month sentence required for Count 3 in

---

[2]       Defendant acknowledges the holdings in *Brown* and *DeJournett* but attempts to distinguish those cases from his own on the ground that unlike the defendants in those cases, his condition to "obey the laws for 2 years" was not backed by a suspended jail sentence.  (ECF #162, Page 5-6.)  Nothing in *Brown* or *DeJournett* can be read to give any weight to that distinction, and Defendant has pointed to nothing in either decision to support his contention.

5

case number 5:20CR482, results in a total advisory Sentencing Guidelines range of 180-210 months imprisonment. Based upon the information set forth below, a sentence above that advisory range is warranted in these cases.

### C. Application of Specific Offense Characteristics

#### 1. Obstruction of Justice

Section 3C1.1 of the United States Sentencing Guidelines provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

U.S.S.G. § 3C1.1.

Application Note 4 to that section provides examples of the type of conduct that warrants the two-level enhancement. The probation officer, in the PSR, applied the enhancement and cited as support Defendant's admission during his April 2022 testimony to attempting to bribe a government witness to claim responsibility for the crack cocaine Defendant possessed on June 24, 2020, as well as Defendant's escape from custody on August 18, 2021, while pending trial in case number 5:20CR482. (ECF #158: PSR, PageID 1158.)

While, as Defendant concedes (ECF #162: Def. Sentencing Memorandum, Page 4-5), his escape from custody is sufficient by itself to support the § 3C1.1 enhancement, this Court can and should find that both grounds cited by the probation officer apply. Section 3C1.1, Application Note 4(E) indicates that "escaping or attempting to escape from custody before trial or sentencing" triggers the enhancement. U.S.S.G. § 3C1.1, n.4(E). As Defendant escaped from custody while pending trial, his conduct plainly warrants the two-level increase under § 3C1.1.

6

*See United States v. Tevepaugh*, 30 F. App'x 330, 331-32 (6th Cir. 2002) (kidnapping defendant's escape from jail prior to trial supported enhancement for obstruction of justice).

Defendant's attempt to bribe a government witness also supports the enhancement. *United States v. Moss*, 9 F.3d 543, 553-54 (6th Cir. 1993) (affirming application of obstruction of justice enhancement where defendant attempted to bribe witness through a third party); *United States v. Withers*, 405 F. App'x 951, 953 (6th Cir. 2010) (obstruction of justice enhancement applied where defendant sent letters trying to influence a witness' testimony).  Pursuant to Application Note 4(A), the obstruction of justice enhancement is triggered by "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."  U.S.S.G. § 3C1.1, n.4(A).  Note 4(B) states that the enhancement applies to "committing, suborning, or attempting to suborn perjury[.]"  U.S.S.G. § 3C1.1, n.4(B).  Defendant's admitted attempt to bribe Leandre Hollinshed, a government witness at trial, encompasses both types of conduct.

During Defendant's April 2022 trial on Counts 1 through 3 in case number 5:20CR482, government witness Leandre Hollinshed testified that Defendant, through Defendant's teenage son, offered him $5,000 to claim responsibility for the crack cocaine recovered after the vehicle pursuit on June 24, 2020.  Hollinshed declined the money and, instead, testified that he did not possess the drugs.  During Defendant's testimony, he admitted attempting the bribe, but claimed that he offered Hollinshed $10,000.  (ECF #85: Trial Trans., PageID 633-34.)

Defendant has objected to the PSR's use of his attempted bribe as grounds for the § 3C1.1 enhancement because, he claims, "[i]t is entirely possible that Mr. Fletcher only wanted the witness to tell the truth and offered to pay the young witness to 'look out for him,' as Mr. Fletcher testified."  (ECF #162: Def. Sentencing Memo, Page 4-5.)  This explanation for the

attempted bribe not only strains credulity but is plainly belied by Defendant's own testimony at trial. Defendant claimed that the drugs belonged not to Leandre Hollinshed, but to Defendant's girlfriend, Savanna Brice, who was in the front passenger seat of the car during the chase. (ECF #85: Trial Trans., PageID 583-84, 632-33.) Defendant further stated that once OSHP troopers attempted to pull the car over, he "grabbed the drugs from her[,]" and told "the little dudes in the back seat, 'I got a thousand for you all, I got a thousand,' and [Hollinshed] just was like, 'I'll take them.'" (*Id.*, PageID 585.) Thus, even by his own version of the events, Defendant knowingly possessed the drugs, which he claimed were Brice's, and knowingly offered the juveniles in the back seat money to take them from him. If that story is "the truth" that Defendant claims he offered Hollinshed $10,000 to tell, it directly placed the drugs in Defendant's hands and showed that he exerted control over them. In light of all of the circumstances, it is plainly absurd to conclude that Defendant was only offering Hollinshed money to testify to that version of events. Instead, Defendant attempted to bribe Hollinshed to testify falsely that the drugs were his, not Defendant's. Hollinshed declined to do so, and the jury's verdict on Count 2 showed that they believed his testimony. Defendant's conduct in attempting to bribe a witness supports the § 3C1.1 enhancement.

### 2. Reckless Endangerment During Flight

The 2-level enhancement pursuant to § 3C1.2 for reckless endangerment during flight also applies in calculating Defendant's offense level. That section states:

> If the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by **2** levels.

U.S.S.G. § 3C1.2.

Defendant does not object to this specific offense characteristic.  Indeed, he committed conduct that fits this enhancement on two separate occasions – June 24, 2020, and September 8, 2020.  On both dates, Defendant led police on dangerous vehicle chases in an attempt to flee from arrest and avoid prosecution for his crimes.  In both instances, Defendant drove his vehicle at high speeds, without regard for traffic laws, at times and in locations where others, including the pursuing officers, were put at risk.  Defendant admitted as much on cross examination during his April 2022 testimony:

> Q:   You also agree with me that that gun was in the car in the back seat where
>        you had put it?
> A.   Yes.
> Q.   And that when the police tried to pull you over, instead of stopping, you
>        took off on that chase?
> A.   Yes.
> Q.   And you were weaving in and out of traffic?
> A.   Yes.
> Q.   Over a hundred miles an hour?
> A.   Yes.
> Q.   Changing lanes?
> A.   Yes.
> Q.   Going on the shoulder?
> A.   Yes.
> Q.   Put a lot of lives at risk that day?
> A.   Say that again.
> Q.   You put a lot of lives at risk that day?
> A.   Yes.
> Q.   Including your son's?
> A.   Yes.

(ECF #85: Trial Trans., PageID 617.)

The Sixth Circuit has found the § 3C1.2 enhancement to apply where defendants lead police on high-speed vehicle chases in an effort to flee.  *United States v. Rapp*, 39 F. App'x 198, 200-01 (6th Cir. 2002) (affirming application of the enhancement where "defendant engaged in a high speed chase which itself created a substantial risk to other motorists"); *see also United*

*States v. Brooks*, 2024 WL 113790, *2 (6th Cir. 2024).  The chases led by Defendant in the instant case clearly support the two-level enhancement.

## III.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSES

### A.  Case Number 5:24CR482

#### 1.  Counts 1 –3

On June 24, 2020, federal agents were conducting surveillance of a hotel in connection with an investigation into Defendant's illegal possession of firearms.  Defendant, who had been unsuccessfully terminated from federal supervised release just four months earlier (ECF #158: PSR, PageID 1168), had recently posted several videos to social media in which he was in possession of multiple semiautomatic pistols.  (See Section IV.A., below.)  As a convicted felon, Defendant was legally prohibited from possessing firearms.

At approximately 12:08 p.m., agents observed Defendant and four other people exit a hotel room and get into a vehicle.  Based upon excessively dark window tints, troopers from the Ohio State Highway Patrol (OSHP), who were assisting federal agents, attempted to conduct a traffic stop of the vehicle.  Rather than stop, the driver of the vehicle, later determined to be Defendant, led police on an extended high-speed pursuit.[3]  Defendant travelled south on I-77 in Akron during mid-day traffic, at speeds exceeding 115 miles per hour, weaving in and out of traffic, and frequently veering onto the shoulder of the highway.  OSHP troopers eventually discontinued the ground pursuit for safety reasons, but an OSHP airplane continued to track the

---

[3]     The other passengers in the vehicle were determined to be Defendant's girlfriend (apprehended on June 24, 2020), his 15-year-old son, and two of his son's friends (one of whom was apprehended on June 24, 2020).

vehicle and provide directions to troopers on the ground, who pursued the vehicle at a safer speed.  After travelling on I-77 for approximately five miles, Defendant exited the highway and continued fleeing through a residential neighborhood.  When Defendant came to a dead-end street, all five occupants fled from the vehicle on foot into a wooded area.  Both the airplane pilot and a trooper on the ground saw the occupants flee.

Upon arriving at the abandoned vehicle, troopers observed and recovered a Norinco MAK-90 Sporter 7.62x39mm semiautomatic rifle in the back seat.  The rifle was loaded with a large-capacity magazine containing 30 rounds of ammunition.

As officers and agents from multiple law enforcement agencies, including OSHP, the Akron Police Department (APD), the Ohio Northeast Smuggling Enforcement Team (ONSET), the United States Marshals Service (USMS), and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), joined the search for Defendant and the other vehicle occupants, they became aware that Defendant was live-streaming the chase on his Facebook page.  On the video, Defendant was seen moving through a swampy area of high grass as he addressed his social media followers.  Referring to the police officers attempting to apprehend him, Defendant stated, "If the police come, fuck them bitches.  I'm shooting them," and, "If them bitches at the end of this woods, I'm shooting at these bitches.  If they at the end of the woods, I'm shooting at these hoes." (*See* Government Exhibit 18, Trial 5:20CR482, April 2022).

Troopers, with the aid of a K9 tracker and support from the airplane pilot, eventually located and apprehended Defendant in a marsh area beyond the woods into which he had initially fled.  As officers led Defendant out of the woods, he repeatedly told them that he would shoot them and that he had people waiting outside the woods to kill the officers.  After he was secured in a patrol car, Defendant stated that he had COVID-19 and needed to go to a hospital.  He then

told troopers that he had swallowed "dope," and that he was experiencing shortness of breath and chest pains.  Defendant was taken to the hospital by EMS, where he was medically cleared for transport to jail.

Investigators returned to the wooded and marshy areas on June 25, 2020, to continue searching for evidence.  While doing so, they located approximately forty grams of crack cocaine near a tree where the airplane pilot had observed Defendant hiding prior to his arrest.

On July 1, 2020, a grand jury in the Court of Common Pleas of Summit County, Ohio, indicted Defendant on charges of having weapons while under disability and improper handling of firearms in a motor vehicle (Summit County case number 2020-06-1553-A).  Defendant was granted bond and placed on home incarceration in that case.

On September 3, 2020, a federal grand jury for the Northern District of Ohio, Eastern Division, returned a three-count indictment against Defendant.  (ECF #1, PageID 1-3.)  The indictment charged Defendant with one count of felon in possession of a firearm and ammunition – the loaded Norinco rifle – in violation of 18 U.S.C. § 922(g)(1); one count of possession with intent to distribute a controlled substance –  the crack cocaine – in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); and one count of possession of a firearm – the Norinco rifle – in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  The indictment alleged that all three offenses occurred on June 24, 2020.

## 2.  Count 4

On September 8, 2020, while Defendant was on bond and home incarceration in the Summit County case, the USMS Northern Ohio Violent Fugitive Task Force (NOVFTF), ONSET, APD, and OSHP, attempted to locate and arrest Defendant on the arrest warrant issued as a result of the federal indictment.  At approximately 2:30 p.m., USMS and APD officers

observed Defendant driving in the City of Akron.  When uniformed APD officers attempted to stop his vehicle, Defendant again led a vehicle pursuit, this time through a residential neighborhood.  During the chase, Defendant fled at speeds up to 60 miles per hour, at one point crashing into a small tree after failing to navigate a curve.  The pursuit ended when Defendant came to a roadblock set up to prevent his further flight.  Investigators then took Defendant into custody.

While at the Summit County Jail on the evening of September 8, Defendant made a phone call to his mother, who included Defendant's girlfriend on the call.  During that conversation, Defendant told his girlfriend that he had left "the thirty up there," and suggested that she could retrace his flight path to retrieve it.  (*See* Government's Exhibit 8, Trial 5:20CR482, August 2023.)  Investigators recognized Defendant's use of the term "the thirty" as a reference to a pistol with a thirty-round extended magazine.  In fact, just three days earlier, on September 5, 2020, Defendant posted a video to his social media account in which he was sitting in a vehicle watching a group of APD officers from a distance.  During the video, Defendant stated, "Somebody needs to pull through and shoot these honkies."  He continued, "I should up the Glock on you punk bitches right now, you bitch."  Defendant then turned the camera to focus on a Glock pistol with a thirty-round extended magazine near the center console.  The following images are taken from the September 5 video:

 

Based upon the jail call and social media video, ATF investigators returned on September 9, 2020, to the path of the previous day's pursuit to look for the firearm Defendant had referenced.  Investigators located a loaded Glock 17 pistol with a thirty-round extended magazine on the front lawn of a residence at the corner where Defendant had briefly lost control of his vehicle and hit a tree during the vehicle pursuit.  The firearm appeared to be the same one seen in the September 5 social media video.  Laboratory testing determined that the DNA profile on the grip, slide, and buttons of the gun matched Defendant's DNA.

On September 24, 2020, a federal grand jury for the Northern District of Ohio, Eastern Division, returned a four-count superseding indictment against Defendant.  (ECF #13, PageID

37-39.)  Counts 1 through 3 set forth the charges from the original indictment, described above. Count 4 charged an additional count of felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1), committed on September 8, 2020.

**B.  Case Number 5:21CR707**

On September 17, 2020, following a hearing on the matter, a United States Magistrate Judge ordered Defendant to be detained pending trial.  (ECF #10, PageID 30-32.)  The Magistrate found that Defendant posed both a danger to the safety of the community and a risk of flight if he were to be released on bond.  (*Id.* at 31.)

On August 12, 2021, Defendant filed a motion for permission to attend the funeral of his 9-year-old daughter, who tragically passed away from carbon monoxide poisoning.  (ECF #31, PageID 143-45.)  The Court granted that motion, allowing Defendant to be released on a one-day furlough, to be supervised by his mother.  (ECF #32, PageID 151-52.)  Defendant was ordered to be released from the Northeast Ohio Correctional Center (NEOCC) at 9:00 a.m. on August 18, 2021, to travel only to the funeral and repass locations, and to return to custody at NEOCC by 7:00 p.m. the same day.  (*Id.*)

Defendant attended the funeral service for his daughter, but did not attend the repass, telling his mother that he instead preferred to stay at her home on East Avenue in Akron and play video games with his teenage son.  But that was a lie.  Instead, Defendant fled from his mother's home at approximately 4:00 p.m. and did not return.  At approximately 7:09 p.m., nine minutes after he was due back at NEOCC, Defendant's mother called 911 to report to the Akron Police Department that Defendant was missing and she did not know his whereabouts.  This Court then issued a warrant for Defendant's arrest for failure to return to NEOCC as ordered.  (ECF # 156, PageID 156

Investigators from the USMS NOVFTF and ATF immediately began searching for Defendant.  On August 20, 2021, while a fugitive, Defendant posted on his "King Fletch 100" YouTube page a WKYC News video reporting on his escape.  Defendant captioned the post, "King fletch a threat to the country."  The following image was taken from Defendant's YouTube page:



Later on August 20, 2021, investigators tracked Defendant to a residence in Akron, where they found him hiding in the basement and arrested him.  In a call to his mother from the Summit County Jail on August 21, 2021, Defendant spoke about his escape.  During that conversation, Defendant's mother, referring to the furlough granted by this Court, told Defendant, "You just shoulda did it right."  Defendant responded, "No, I shouldn't have, man.  No, I shouldn't have.

I'm just mad I ain't just have no gun." (*See* Government Exhibit 16: Jail call excerpt, Trial 5:21CR707.)

On September 30, 2021, a federal grand jury for the Northern District of Ohio, Eastern Division, returned an indictment charging Defendant with one count of escape, in violation of 18 U.S.C. § 751(a).  (Case no. 5:21CR707, ECF #1, PageID 1-2.)

### C.  Trials and Convictions

Defendant has been tried and convicted on all counts in both cases 5:20CR482 and 5:21CR707.

On April 15, 2022, following a five-day trial, a jury found Defendant guilty of Counts 1, 2, and 3 of the superseding indictment – one count of felon in possession of a firearm and ammunition; one count of possession with intent to distribute a controlled substance; and one count of possession of a firearm in furtherance of a drug trafficking offense – in case number 5:20CR482.  (ECF #74, PageID 481-86.)

On August 23, 2023, following a three-day trial, a jury found Defendant guilty of Count 4 of the superseding indictment – felon in possession of a firearm and ammunition – in case number 5:20CR482, which had been severed from Counts 1through 3 for trial.  (ECF #148, PageID 1042.)

On December 14, 2023, following a two-day trial, a jury found Defendant guilty of escape in case number 5:21CR707.  (Case no. 5:21CR707, ECF #22, PageID 156.)

17

## IV.    HISTORY AND CHARACTERISTICS OF THE DEFENDANT

### A.  Defendant's Criminal History

The PSR thoroughly documents Defendant's extensive criminal history, which shows his repeated commission of crimes involving violence, threats of violence, drug trafficking, and illegal firearm possession.  (*Id.*, PageID 1159-74.)  Along with the types of offenses for which Defendant has been convicted, it is important for the Court to consider the facts of many of those crimes, which show Defendant's utter failure to show any remorse for his offenses or acknowledgment that his criminal conduct is wrong and harmful to others in the community.  Rather, Defendant's criminal history demonstrates a complete disrespect for the law and the Courts in which he has been convicted, of which the following examples are illustrative:

- On November 4, 2005, Defendant (age 18) was convicted of Aggravated Menacing (M1) in the Akron Municipal Court.  That conviction arose from an incident in which Defendant, while speaking with Akron Police officers investigating him for drug activity, told the officers he would "lay [them] out in the street."  (*Id.*, PageID 1162, ¶ 71.)

- On March 3, 2006, Defendant (age 18) was convicted in the Summit County Court of Common Pleas of Trafficking Cocaine (F3), Possession of Cocaine (F3), Trafficking Marijuana (F5), Possessing Criminal Tools (F5), and Criminal Gang Activity (F2). Those convictions arose from a stop of a vehicle by Akron Police and the discovery of crack cocaine and marijuana packaged for sale.  Defendant, a rear passenger, told police that the drugs did not belong to him and that the officers would never catch him in possession of drugs because his 13 or 14-year-old "street soldiers" handled them for him.  While serving a four-year prison sentence for these convictions, Defendant amassed sixty-two disciplinary violations for various infractions, including disobeying orders, fighting, refusing work assignments, disrespect to staff, possession of contraband, threatening bodily harm, and masturbating in front of staff.  When he was released from prison and placed on post-release control, he violated the conditions of his supervision and was sent back to prison twice.  (*Id.*, PageID 1164, ¶ 74.)

- On April 11, 2012, Defendant (age 24) was convicted in the Summit County Court of Common Pleas of Having Weapons While Under Disability (F3) and Tampering with

18

Evidence (F3).  Those convictions arose from an incident in which Defendant and another person arrived at an Akron hospital with gunshot wounds.  While on bond pending trial, Defendant violated the Court's conditions and his bond was revoked.  While serving a 12-month prison sentence for the offenses, Defendant accrued sixteen violation reports for possession of contraband, disobeying orders, fighting, testing positive for marijuana, and threatening bodily harm.  (*Id.*, PageID 1167, ¶ 74.)

- On March 18, 2015, Defendant (age 27) was convicted in the United States District Court for the Northern District of Ohio of being a Felon in Possession of a Firearm and Ammunition.  Defendant committed that offense *while on post-release control for Having Weapons While Under Disability in the case described above*.  The federal conviction arose from an incident in which Defendant threatened a female acquaintance with a firearm.  After serving a sentence of 39 months imprisonment, Defendant was placed on a three-year period of supervised release.  He violated the conditions of his supervision within two months of his release and was returned to prison.  After completing that sentence, Defendant was again placed on supervised release, which he again violated and was sentenced to time served.  (*Id.*, PageID 1167-68, ¶ 82.)

- On July 31, 2018, Defendant (age 30), was convicted in the United States District Court for the Northern District of Georgia of Possession of a Prohibited Object by and Inmate of a U.S. Penitentiary.  That conviction arose from an incident in which Defendant, *while serving the sentence for the federal supervised release violation described above*, possessed a cellular phone in a federal prison.  Defendant used the phone to stream a 49-minute video on his Facebook page from inside the facility.  During that video, Defendant referred to himself as "a motivational speaker for gangsters," bragged about his ability to obtain a phone "anywhere I'm at," and asserted, "I run Akron."  He also claimed credit for a 2010 Akron murder for which Defendant's associate was convicted and sentenced.  After serving an 8-month prison sentence, Defendant was placed on one year of supervised release, which was revoked after he violated the conditions of supervision by possessing ammunition in his residence.  (*Id.*, PageID 1168, ¶ 83.)

- On December 3, 2019, Defendant (age 30) was convicted of Disorderly Conduct (M4) in the Akron Municipal Court.  That charge arose from an incident in which Defendant sent several text messages to a female acquaintance (the same female Defendant threatened in 2015, resulting in his federal firearm conviction) threatening to have her killed.  Defendant was placed on one year of probation.  (*Id.*, PageID 1169, ¶ 84.)  Approximately six months into his probation term, Defendant committed the offenses charged in Counts 1, 2, and 3 in the instant case 5:20CR482.

Defendant has been sentenced to prison at least eight times, serving sentences between seven months and four years.  None of those sentences have deterred him from quickly returning to criminal activity upon release from prison.  Nor has any time spent in custody or under the supervision of various courts led Defendant to demonstrate remorse for his crimes or any effort to rehabilitate himself.  To the contrary, Defendant has consistently boasted about his crimes and used them to bolster his status as a prominent Akron-area criminal.  For example, on January 22, 2020, *while on federal supervised release and state probation*, Defendant posted a video to his Facebook page captioned, "Me practicing how ima rob the plug."[4]  In the video, Defendant handed a large bundle of cash to a person off-camera and then, holding a semiautomatic pistol (which he was legally prohibited from possessing), mimicked robbing the person at gunpoint to obtain the cash.  The following image is taken from that video:

---

[4]      The term "plug" is common slang for an individual who supplies illegal drugs to a lower-level dealer.



In another video posted by Defendant to his Facebook page on June 20, 2020, *four days prior to committing the offenses in Counts 1 through 3 of case number 5:20CR482*, Defendant described having just robbed an individual at gunpoint and stolen jewelry and a firearm from him because that individual owed Defendant money.  In the video, Defendant was seen holding two semiautomatic pistols, one of which he stated he stole during the robbery.  Defendant stated, "I was going to smoke him, because that's all I know, for real."  He further explained, "I was going to blow his head off," apparently because the individual almost broke the chain that Defendant stole from him.  The following image is taken from that video:



The above examples show what this Court can expect from Defendant when he is released from custody.  There is little likelihood that any prison sentence will have a rehabilitative effect.  Rather, Defendant's past post-sentence conduct strongly suggests that he will only return to criminal activity involving threats of violence and illegal firearm possession. Defendant's criminal history, coupled with his demonstrated intent to continue committing crimes, weighs heavily in favor of an upward variance in the cases now before the Court.

**B.  Defendant's Testimony and Conduct at Trial**

**1.   Defendant's Testimony Regarding Firearm Possession**

As this Court is aware, Defendant elected to testify at each of his three trials in the instant cases.  During his testimony at the April 2022 trial regarding Counts 1 through 3 of case number

5:20CR482, Defendant admitted knowingly possessing the Norinco rifle recovered from his vehicle on June 24, 2020.  He also testified that, despite knowing that as a convicted felon it is illegal for him to possess firearms, he regularly carries a gun.  Specifically, Defendant testified, "I'll be honest, I just don't see myself going out in public without a firearm."  (ECF #85: Trial Trans., PageID 558.)  Later in his testimony, Defendant stated, "But that's why I just had the [Norinco] rifle come out because I was going out into the community, and I ain't want to go out into the community without a firearm."  (*Id*, PageID 560.)  In addition to simply possessing the gun, Defendant also made sure it was loaded and ready to fire.  He stated, "I had cocked it back and put – put a bullet inside the chamber, and I wrapped it up and put it back in the bag."  (*Id.*, PageID 566.)

During his August 2023 trial, Defendant again testified about his claimed need to have firearms while out in public.  While giving largely false testimony about two unnamed and unseen individuals who he alleged were in his vehicle as he led APD officers in a pursuit on September 8, 2020, Defendant asserted that in order to avoid being caught in possession of firearms himself, he ensures that his associates always have firearms when they are with him.  While the testimony was clearly false – Defendant himself possessed the Glock firearm recovered after the chase – it again demonstrated Defendant's intention to ignore the law and to continue to possess – even by his own version, constructively – firearms despite his status as a felon multiple times over.

As noted above, Defendant has previously been convicted of illegally possessing firearms twice, both in state and federal courts.  He has served a total of approximately five years in prison for those offenses.  Still, Defendant admitted that after serving those sentences he knowingly and intentionally disregarded the law and continued to carry firearms when in the

community.  Moreover, even while on bond for the state indictment related to his possession of the Norinco rifle on June 24, 2020, Defendant again possessed a Glock pistol loaded with a 30-round magazine on at least two occasions – during the September 5, 2020, social media video described above, and at the time of his arrest in this case on September 8, 2020.  Thus, all of the evidence before this Court, most significantly Defendant's own statements and conduct, shows that it is highly unlikely that Defendant will refrain from illegally carrying firearms in the future. Therefore, to protect the public from the danger posed by Defendant, a long period of separation from the community is necessary.

### 2.  Defendant's Conduct During His April 2022 Trial

Defendant's conduct during his April 2022 trial also demonstrated both the danger he poses to others and his lack of respect for the Court.  Specifically, on Day 3 of trial, the United States Marshals providing security alerted the Court that Defendant stated that his attorney "was about to get a right hook" from him because Defendant was unhappy with how counsel was conducting the trial.  (*Id.*, PageID 517-19.)  Then, during the lunch break Defendant asked the Deputy Marshals if they carried firearms in the courtroom.  (*Id.*)  He then told the officers, "You all are going to have to shoot me because I'm about to jump on my attorney."  (*Id.*)

When the Court inquired of Defendant about the incident in order to ensure the security of the courtroom, the following exchange occurred:

> THE COURT:  I received some concerns, as I should, because the Marshals working with me here have to have every concern for all of us, and there were some comments that you allegedly made to them which caused the concern.
>
> ***
>
> So I heard you're making comments asking questions about whether the officers were armed.

       ***

       So what -- why are you saying things like that to the Marshal, and tell me what's on your mind?

DEFENDANT: Because they keep playing me. I'll make them kill me in here.

THE COURT: What?

DEFENDANT: They keep playing me, I'll make them kill me right here in this courtroom. I'll make them kill me right here.

THE COURT: What do you mean by that? Why do you say that?

DEFENDANT: Because I'm not about to let nobody just sit around here and play with me. Ain't no way. No. No.

       ***

THE COURT: So I don't like the sounds of what you're saying. You're saying you're going to make them kill you in the courtroom right here.

       For what -- make who? Who's going to make them kill you in the courtroom?

       Who are you talking about?

       What would you do that would make them kill you here? That's what I want to know.

DEFENDANT: I'd do anything.

THE COURT: What?

DEFENDANT: I'd do anything.

THE COURT: When?

DEFENDANT: Anytime.

(*Id.*, PageID 520-25.)

Defendant's conduct was clearly a significant concern for the safety of the proceedings, and the Court took appropriate steps to manage the risk Defendant posed in the courtroom.  But

25

it is also emblematic of the characteristics Defendant has intentionally developed for himself during his history of criminal activity.  He routinely threatens to harm others without hesitation or remorse, and he thrives on the reputation for violence that he has created for himself.  While the Court was able to mitigate the risk Defendant posed during trial, there are no such limits on his conduct when he is in the community.  The only way to prevent Defendant from continuing to threaten the safety of others is to keep him out of that community through a lengthy prison sentence.

## V.     NEED FOR THE SENTENCE IMPOSED TO ADDRESS THE GOALS OF SENTENCING UNDER 18 U.S.C. § 3553(a)

Section 3553(a) requires the Court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth under the statute.  18 U.S.C. § 3553(a).  In Defendant's cases, the 240-month sentence which the United States recommends is necessary to fulfill that mandate.

First, a shorter sentence would fail to adequately reflect the seriousness of Defendant's crimes.  "[D]rug trafficking is a serious offense that, in itself, poses a danger to the community." *United States v. Stone*, 608 F.3d 939, 947 n.6 (6th Cir. 2010).  "[A] defendant's 'penchant for combining firearms and drugs' demonstrates his danger to the community."  *United States v. Coleman*, No. 23-1445, 2023 U.S. App. LEXIS 18144, at *5-6 (6th Cir. July 17, 2023) (quoting *United States v. Voog*, 702 F. App'x 692, 694 (10th Cir. 2017)).  While this Court frequently imposes sentences for drug trafficking and firearms offenses, this case presents significantly more serious forms of those offenses than most others.  Specifically, in committing the offenses on June 24, 2020, (Counts 1-3, 5:20CR482) Defendant possessed a semiautomatic firearm, loaded with a round in the chamber.  He then increased the danger and seriousness of his conduct by leading police on a high-speed chase, all while involving his teenage son and two other

juveniles in his crimes.  Defendant thought nothing of putting those juveniles in that position.

Indeed, Defendant testified, "After we went on the high-speed chase, I didn't have to tell nobody

to run…Because it was it pretty much just came natural to everybody in the car that we was

running from the police."  (ECF #85: Trial Trans., PageID 618.)  When an adult involves

juveniles, and a father involves a child, in his dangerous criminal activity, the sentence must

account for the increased seriousness of that particular offense.

Likewise, Defendant's decision, on September 8, 2020, while under indictment and on

bond in the Summit County Court of Common Pleas for his June 24 offenses, to again illegally

possess a firearm, this time loaded with a 30-round magazine, and to again lead police on a

dangerous vehicle chase, renders that offense more serious than the run-of-the-mill felon in

possession of a firearm cases that come before this Court.  The sentence in these cases must

consider Defendant's return to criminal conduct within just a few months of his initial charges.

Next, the sentence must promote respect for the law.  Unfortunately, it is unlikely that any

sentence this Court imposes will have that effect on this particular Defendant.  As noted above,

he has lived a life devoid of any respect for the law or acknowledgment of the wrongfulness of

his criminal conduct.  His actions in these cases have reinforced the fact that he lacks any respect

for the law, for law enforcement, or for the Court.  Most notably, when this Court gave

Defendant the opportunity to attend his young daughter's funeral, he took advantage of that

generosity by escaping from custody.  In fact, Defendant did not even show up to the repass that

he had specifically sought permission to attend.  Then, at trial for that offense in December 2023,

his defense was a plainly false assertion that he was unaware of when he was supposed to return

to custody.  He showed no acknowledgment of the Court's consideration for his family

circumstances in allowing him a furlough, and no remorse for violating the Court's trust by

27

escaping.  If those circumstances did not cause Defendant to show even the smallest respect for the law, it is difficult to believe any sentence will do so.

But the Court's sentence must also provide just punishment for the crimes committed by Defendant.  A sentence of 240 months is sufficient but not greater than necessary to achieve that goal.  As shown above, the manner in which Defendant committed these crimes takes them "outside the 'heartland'" to which the Guidelines are intended to apply and justifies an upward variance.  *See Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *United States v. Perez-Rodriguez*, 960 F.3d 748, 754 (6th Cir. 2020).  Defendant did not commit run-of-the-mill forms of these crimes and, thus, his conduct does not warrant a run-of-the-mill Guidelines sentence.  The United States' recommended sentence would provide a just punishment.  A lesser sentence, and certainly the ten-year mandatory minimum sentence Defendant requests, would not adequately punish Defendant for the egregious nature of the crimes he has committed in these cases.

Next, the Court must fashion a sentence that will "afford adequate deterrence to criminal conduct[.]"  18 U.S.C. § 3553(a)(2)(B).  "This factor includes two components—specific deterrence and general deterrence. Specific deterrence looks to dissuade an individual defendant from committing future crimes, while general deterrence aims to have the same effect on the population at large."  *United States v. Boucher*, 937 F.3d 702, 710 (6th Cir. 2019).  As with promoting respect for the law, it is unlikely that the Court's sentence, whatever it is, will deter Defendant from future criminal conduct.  He has clearly established himself as a repeat criminal with no intention to stop violating the law.  A long sentence in these cases can serve a general deterrent purpose, however.  Because of the reputation Defendant has created for himself, the sentence imposed by this Court will be noted by others in the Akron area.  A significant sentence

28

will demonstrate that individuals who repeatedly violate the law and celebrate themselves for doing so will be subject to a long period of incarceration.  By contrast, if Defendant, well-known among criminals in the Akron area, having committed drug and firearms offenses on two separate occasions in these cases and then having escaped from custody while pending trial for those crimes, receives a lenient sentence, others will note that as well, and the deterrent effect will be greatly reduced.  This sentencing factor weighs heavily in favor of the 240-month sentence recommended by the United States.

Perhaps the most significant sentencing goal in these cases, however, is "to protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  Because any sentence is unlikely to inspire in Defendant a respect for the law or an effort to refrain from returning to crime after his release from prison, a long sentence is needed to protect the public from Defendant.  His criminal history has shown that there simply is no other way to ensure that the community will be spared the consequences of Defendant's crimes.  Every time Defendant has finished serving a sentence in the past, he has quickly returned to criminal activity.  Court supervision, whether federal or state, has not had any effect in curbing that recidivism, as Defendant has frequently committed crimes while on supervision.  The community deserves to be safe from Defendant's dangerous and violent conduct.  A long period of incarceration is the only way to provide that safety.

## VI.    CONCLUSION

Defendant is before this Court for sentencing on five serious offenses.  In light of the

nature and circumstances of those offenses, Defendant's history and characteristics, and the goals

of federal sentencing, the United States asks the Court to apply an upward variance from the

advisory Guidelines range recommended in this memorandum and impose a sentence of 240

months imprisonment.

<div style="margin-left: 50%">

Respectfully submitted,

REBECCA C. LUTZKO
United States Attorney

By:    /s/ Peter E. Daly
Peter E. Daly (OH: 0084745)
Assistant United States Attorney
Federal Building
2 South Main Street, Room 208
Akron, OH 44308
(330) 761-0529
(330) 375-5492 (facsimile)
Peter.Daly@usdoj.gov

</div>